UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
LUFKIN DIVISION

| | | |
|---|---|---|
| AMANDA DAUGHERTY, § | | |
| § | | |
| Plaintiff, § | | |
| § | | |
| v. § | CIVIL ACTION NO. _____ | |
| § | | |
| EDWARD D. JONES & COMPANY, L.P., § | JURY TRIAL | |
| § | | |
| Defendant. § | | |
| § | | |

**PLAINTIFF'S ORIGINAL COMPLAINT**

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, Amanda Daugherty, (hereafter Plaintiff) to file this her original complaint against Edward D. Jones & Co., L.P. (hereafter Edward Jones or Defendant) for terminating Plaintiff's employment with Edward Jones in violation of the Title VII of the Civil Rights Act of 1964 as codified, 42 U.S.C. §§ 2000e to 2000e-17. Plaintiff was subjected to severe and pervasive discriminatory conduct by Edward Jones during her employment culminating in her unlawful termination. Following her termination, Defendant Edward Jones disparaged Plaintiff's business reputation causing further and additional damage to Plaintiff's business interests.

**Parties**

1. Plaintiff, Amanda Daugherty, a female, is (37) years old and resides in Nacogdoches, Texas and worked for Edward D. Jones & Co., L.P. from November 30, 2015 until terminated by Edward Jones on April 18, 2019.

2. Defendant, Edward D. Jones & Co., L.P. is a Missouri Limited Partnership with its principal place of business at 12555 Manchester Rd, Saint Louis, MO, 63131-3710 and whose

registered agent for service is C T Corporation Systems.

## Jurisdiction and Venue

3.     This Court has general federal question jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because Plaintiff has brought a claim pursuant to Title VII of the federal Civil Rights Act of 1964. This Court has supplemental jurisdiction of Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

4.     The Eastern District of Texas is the proper venue for jurisdiction pursuant to 28 U.S.C. § 1391 because a substantial parts of the events or omissions giving rise to the claim occurred in Nacogdoches, Texas 28 U.S.C. § 1391(b)(2) Plaintiff is a resident of Nacogdoches, Texas 28 U.S.C. § 1391(c)(1) and Defendant is subject to the court's personal jurisdiction with respect to the civil action in question and Plaintiff's maintains her principal place of business in Nacogdoches, Texas 28 U.S.C. § 1391(c)(2).

## Statement of Facts

5.     Edward Jones is a nationwide company with greater than fifteen employees.

6.     Plaintiff, a young female, joined[1] Edward Jones to operate the Edward Jones's branch office located at 424 E. Main Street, Nacogdoches, Texas (hereafter "branch" or "the branch"), on November 30, 2015 as a Financial Advisor.

7.     Plaintiff was hired to replace another female advisor who was relocating due to her husband's work.

8.     Plaintiff was told that the branch she was assigned to was not a particularly profitable branch and had not been particularly desirable for the prior fifteen years.[2]

---

1   Plaintiff was recruited to join the Firm by Wells Fargo Advisors.
2   The Wells Fargo Advisor informed Plaintiff that she would have her own branch and the ability to make it her own. The Wells Fargo Advisor incentivized Plaintiff during recruitment by informing her that she could bring her children to work if needed because the Wells Fargo Advisor was aware that Plaintiff was getting ready to have a new baby.

9. As a Financial Advisor for Edward Jones, Plaintiff managed the branch and was responsible for developing a roster of business for Edward Jones from existing branch clientele and developing new business for the branch.

10. In managing and developing new business for the branch Plaintiff was required to meet certain production levels for the growth of the branch.

11. Plaintiff dedicated herself to the development of her roster of business for Edward Jones and over the course of her three and one-half years of employment turned the branch around making it extremely profitable and one of the best performing branches in her district.[3]

12. The Edward Jones leadership team expressly credited Plaintiff with preventing the branch from "dying off" and attributed the branch's success to her dedication and effort.

13. As a result of the branch's success, Plaintiff was in line for promotion to the top pay grade among Edward Jones Financial Advisors.

## Discriminatory Conduct

14. As part of Plaintiff's employment with Edward Jones, Plaintiff was required to go to mandatory training.

15. Mandatory training was structured so that members of Edward Jones leadership team would groom and mentor newer employees like Plaintiff to facilitate their completion of the training program preparing them for advancement within the company.

---

[3] The Firm ranked branch success on a leveled scale (0 to 10). Prior to Plaintiff's employment, the branch was at level 0. After three and a half years of Plaintiff's hard work and dedication, she increased the branch's level to level 5.

16.  While training[4] in Tempe, Arizona in December 2015, Plaintiff met Chris Gervais ("Gervais"), who was a part of the leadership team[5] in Tempe who was in a senior position to that of Plaintiff in Edward Jones.

17.  Plaintiff, who was thirty-two years old at the time, became Gervais's target for sexual harassment and conquest.

18.  Plaintiff was vulnerable[6] and looked up to Gervais, who was older and occupying a leadership role at Edward Jones, as a potential mentor.

19.  At the end of the Professional Development Program ("PDP") training week[7], Gervais propositioned Plaintiff outside of her hotel room and continued to press Plaintiff for a sexual encounter in order to "get their relief" from the high stress of working at the Firm.

20.  Gervais continued to pressure Plaintiff by stating that everyone at the Edward Jones has sex with each other and that the firm culture was "just like the Olympics, where condoms are the most purchased item by the athletes."

21.  After Plaintiff had denied Gervais and closed herself in her hotel room, Gervais continued to send sexually inappropriate text messages to Plaintiff insisting, among other things, that "it took everything not to kiss [her] good night," "[he didn't] think [he] could stop though with just a kiss," and that they "would both be extremely satisfied, [Plaintiff] over and over" with "some amazing things with [his] hands and tongue."

---

4   This was the first mandatory training week attended by Plaintiff and was classified as "Know Your Customer" training.
5   Gervais was considered a "visiting veteran." A "veteran" is considered an individual with experience in the financial business. The leadership team at the Firm selects individual "veterans" that meet certain criteria to participate in training newly employed financial advisors at the Firm. A "veteran" becomes a "visiting veteran" when the Firm flies them from their home locations to the training program site.
6   Plaintiff was suffering from postpartum depression.
7   This was the third mandatory training attended by Plaintiff.

22. On Plaintiff's last day of PDP training in Tempe, Gervais asked to meet Plaintiff in private where she thought he would apologize for his behavior the night before. Instead, Gervais forcibly kissed Plaintiff.

23. Later, In July 2016, Gervais insisted that Plaintiff fly out to Minnesota to meet for further training and provided airline tickets for Plaintiff.

24. Upon arrival in Minnesota, Plaintiff learned there was no training event scheduled, but instead Gervais was using "training" as an excuse to force Plaintiff to come to meet Gervais at his home many states away from her branch.

25. While in Gervais's home in Minnesota, Mr. Gervais aggressively kissed the Plaintiff, then pressured Plaintiff into a forced sexual encounter.

26. Subsequent to Gervais luring Plaintiff to Minnesota, Plaintiff discovered that Gervias predatory conduct was known by Edward Jones. as Gervais had received counseling for his behavior.

27. Upon inquiry, Gervais's wife, Ms. Gervais, confirmed that Edward Jones was aware of Gervais's previous unlawful conduct but did nothing to remedy it.[8]

28. Despite Gervais status as a sexual predator and repeat offender, Edward Jones' management permitted Gervais to continue in his leadership role grooming young female employees of Edward Jones at out of state mandatory training events which led directly to Plaintiff's victimization.

### Disparate and Irregular Treatment of Plaintiff and Her Abuser

29. After Plaintiff complained of Gervais's predatory behavior, Edward Jones treated Gervias and Plaintiff differently and in irregular ways.

30. Gervais was permitted to resign without further adverse action.

---

[8] Ms. Gervais spoke to and informed Plaintiff's husband at the time of this information, as well as texted the Plaintiff.

31.     Despite having knowledge of Gervais prior tendencies and having delivered Plaintiff to Gervais for grooming and mentoring, Edward Jones wholly failed to prevent and promptly correct the harassing behavior, but instead brought adverse action against the victim making a formal warning of her "unprofessional conduct" part of her employment record.

32.     Eventually, Edward Jones used this event as a basis for the unlawful termination of the Plaintiff, despite Plaintiff being the victim of the sexual grooming and harassment by the team leader Gervais.

33.     Compounding the disparate treatment of Plaintiff and Gervais, in the financial services industry, financial advisors must report the reasons they were terminated on FINRA's website, called "Broker Check,"[9] and provide the information on their "U5" reporting document.

34.     The FINRA site Broker Check lets the world know why an individual Financial Advisor was terminated and has severe repercussions for that individual's career prospects.

35.     The U5 information for Chris Gervais provided by Defendant states Grevais "voluntarily resigned" even though in reality he left as a result of his predatory sexual exploitation of the women the Firm placed in his care.

36.     Broker Check is made a part of and is displayed prominently on Edward Jones home page internet site[10].

37.     As a result of the difference in treatment with Edward Jones permitting Chris Gervais to resign, Chris Gervais obtained fruitful subsequent employment at LPL Financial LLC, and has remained employed there since.

38.     Contrary to the whitewashed U5 for Gervais, Plaintiff's U5 states she was discharged for "non-conformity with HR policies/guidelines. Not security or client related".

---

9   Broker Check by FINRA, https://brokercheck.finra.org/
10  Edward Jones Home Page featuring Broker Check; https://www.edwardjones.com/us-en/homepage

39. As a result of this disparity in treatment, Plaintiff was unable to find similar employment for an extended period of time following her unlawful termination at Edward Jones, and was denied the promotion to the highest earning level she had met all conditions for.

### Kathy Parker

40. While Plaintiff was going through the trauma associated with her ordeal with Gervais, she developed a friendship with her Branch Office Administrator, Kathy Parker ("Parker").

41. As part of their friendship, Parker and Plaintiff would discuss personal matters, including but not limited to, faith, relationships, sexual partners, and her experience with Gervais. Parker and Plaintiff would often pray together.

42. From he beginning of Plaintiff's employment at the Firm, Parker encouraged Plaintiff to bring her children to work, as other employees did, so that Plaintiff would not have to work from home and could tend to her clients who were only available during school breaks[11].

43. Parker both voluntarily and eagerly, watched Plaintiff's children at the Firm. Parker would bring coloring books and other activities for the children to use. In fact, Parker had filled an entire drawer in the Firm with activities and toys that the children could play with while they were at the Firm.

44. Parker became so involved in Plaintiff's and Plaintiff's children's lives that she would often refer to herself as a "second Mom" to Plaintiff, as well as "Aunt Kathy" to Plaintiff's children.

45. Parker came to birthday parties, was an emergency contact for Plaintiff's children at school, offered to assist Plaintiff with relocating personal items from her home after the forced

---

11   Plaintiff's children attended Stephen F. Austin State University ("SFA") Early Childhood Lab and had breaks from school at certain times during the day. Many of Plaintiff's clients were SFA employees and were only available during the same break times as Plaintiff's children.

encounter with Gervais, and did everything she could to integrate herself into Plaintiff's personal life.

46. In Fall 2018 after Plaintiff returned from maternity leave, she noticed that Parker made continued recurring errors, let matters slipping through the cracks, and failed at simple issues such as mailing required basic information to clients.

47. While Plaintiff provided ample support and resources to help Parker with these performance concerns, she saw little to no improvement.

48. As Plaintiff's branch grew, the need for a skilled and competent office assistant became manifestly apparent.

49. Plaintiff began to raise concerns regarding Parker's performance issues to other leaders in Edward Jones, both in and out of her Region.

50. Plaintiff's desire for assistance became acute when Plaintiff noticed the start of insubordination, passive-aggressive behavior, a defensive attitude, and intentional mistakes made to make Plaintiff look bad to her clients.

51. Once others became involved and Parker was aware of the high level of concern, Plaintiff's relationship with Parker started to dramatically deteriorate.

52. Plaintiff and Parker began "Ted Jones Coaching"[12] in December of 2018 with Ben Cromwell ("Cromwell"). During this time, Plaintiff discussed her concerns with Parker to Cromwell, as well as requested guidance from Cromwell on how to better coach Parker and increase her accountability and performance.

53. Cromwell advised Plaintiff that her regional leader and an associate relations team should get involved.

---

12  "Ted Jones Coaching" is a program offered at the Edward Jones. The leadership team selects candidates that they believe are performing well and are in good status. The candidates are then paired with a mentor for additional job performance coaching.

54. Plaintiff called associate relations in late January 2019 to express her frustration with the lack of performance by Parker. As a result of this call, Tom Korte ("Korte") was assigned to assist Plaintiff and Parker in addressing these various concerns in multiple coaching sessions.

55. During Plaintiff and Parker's coaching sessions with Korte, Plaintiff would raise issues such as Parker falsifying information during account setup for individual clients; this caused Parker to cry, repeatedly, during the call with Korte.

56. After the conference call with Parker and Korte that resulted in Parker getting her first warning, Plaintiff informed Korte that she was fearful of Parker intentionally sabotaging her at the office for what Parker stated was Plaintiff "throwing her under the bus."

57. Despite Korte dismissing Plaintiff's concerns, Parker did exactly that.

58. Parker intentionally refused what Plaintiff asked and continually made mistakes, including but not limited to: 1) Manipulated requests (by changing dates and times on to-dos that were assigned); 2) Pushed back to-dos (would ask Parker to complete certain tasks by end of day and she would push back to next day several times until Plaintiff had to address why the task wasn't getting completed); 3) Failed to follow up or confirm appointments[13]; 4) Failed to send paperwork out timely, or at all[14]; 5) Continued to perform rollover tasks out of order[15]; 6) Had inappropriate financial conversations with clients[16] on behalf of Plaintiff during new account set up without direction from a financial advisor, in violation of securities regulatory laws.

59. As advised to by Korte, Plaintiff documented all the concerns she had in dealing with Parker. Plaintiff emailed Korte approximately four times with documentation of her

---

13  Specifically, Mr. Macky, Ms. Ramos, Ms. Kite, Mr. Makow.
14  Specifically, Mr. & Mrs. Ramos.
15  Specifically, Mr. & Mrs. Edinger, Mr. Ballew, Sandy Ryan.
16  Specifically, Mr. & Mrs. Lewis concerning stocks, and Ms. Waters and Ms. Hardy involving answering risk tolerance questions.

concerns with Parker. Additionally, Plaintiff would call Korte or her regional leader any time that she needed advice or guidance related to her concerns about Parker.

60. Despite Plaintiff's continued documentation and requested advice, dward Jones took no action to address Plaintiff's concerns or to provide her with the support she requested.

61. In April 2019, Plaintiff was on a call with Cromwell when she informed him that associate relations were coming to Plaintiff's office that day to discuss the issues that Plaintiff and Parker were having.

62. When associate relations arrived, to Plaintiff's surprise, associate relations were interested in Plaintiff, rather than Parker.[17] Specifically, Plaintiff was questioned on her forced sexual encounter[18] in 2016 with Gervais[19], her leaving her breast pumping apparatus drying in the kitchen sink area, bringing her children to work[20], as well as the private and personal discussions with Parker regarding their respective prior sexual partners and Plaintiff's marital matters.

63. Nothing of Parker's malfeasance or negligence was discussed; nothing of Gervais's unlawful conduct was discussed; nothing of the Firm's failure to provide a workplace free of sexual predators and overt sexual discrimination was discussed. Instead, Plaintiff's sexuality became the topic of conversation, as well as the purportedly "inappropriate" display of breast pumping bottles and milk tubes to fill bottles left on a drying rack in the galley kitchen.

64. Edward Jones' associate relations conduct left Plaintiff feeling "body-shamed" as she was forced to defend why she had left her breast-pumping materials on the sink to dry between pumping sessions and client appointments.

---

17  After Plaintiff informed Cromwell of associate relations planned visit, Cromwell immediately stated that "associate relations don't fly in for branch office administrators, and that the associate relations personal were coming for Plaintiff."
18  Which associate relations referred to as an "affair."
19  Based upon the information Parker provided to Korte and associate relations.
20  Disregarding the fact that not only did many other employees also bring their children to work, but also that Parker was the employee in the Firm that encouraged Plaintiff to bring her children to work.

Case 9:21-cv-00066-RC-ZJH   Document 1   Filed 04/06/21   Page 11 of 17 PageID #: 11

65. This was in start contrast to how Edward Jones represents itself to the rest of the world, often touting itself as being "family-friendly" on its career pages and trumpets the fact that it has been recognized as one of the top 100 "Best Workplaces for Women" in the country.[21]

66. Edward Jones permits its Female Financial Advisors to bring their children to work as part of their regular business practices. However, this courtesy was not extended to the Plaintiff, and instead, Plaintiff was treated differently, was chastised and shamed for being a mother, as well as taking care of her children.

67. The fact that Plaintiff brought her children to work when she had no other choice, had pumped breast milk for her newborn child during the day, out of site and between client meetings and appointments, and had suffered a forced sexual encounter with Gervais in 2016, all culminated in Plaintiff's termination on April 18, 2019.

**Dane Phillips**

68. After Plaintiff's termination, she was replaced by Dane Phillips ("Dane"), a male.

69. Dane is the son of David Phillips Senior ("David"). This is germane only to point out that David was a key leader on the regional leadership team and operated an Edward Jones three-tenths of a mile from the one Plaintiff was assigned.

70. David operated his branch for about seventeen years, and unlike Plaintiff's branch prior to her employment, David's branch was known as profitable.

71. David's secretary, Diane, was very close friends with Parker. Consequential to this fact, Parker informed Diane of Plaintiff's personal matters from 2016 that Plaintiff had discussed with Parker in confidence and trust.

---

[21] https://careers.edwardjones.com/explore-opportunities/new-financial-advisors/support/programs/women.html

72. Plaintiff was introduced to Dane for the first time on March 28, 2019, at the Jim Weddle event hosted by the Firm in Nacogdoches. At this time, Dane was studying to pass financial licensing exams in expectation of working at his father, David's, office.[22]

73. Debra Dominy, a regional leader, suggested that Parker should go work with Dane at David's office because Dane was new and at a "level" that Parker could operate.[23] Parker called Plaintiff to inform her that she wanted to pursue working with Dane and that Diane was setting up an interview for her.

74. Parker was denied an interview when Debra Dominy called David to inform him that Parker was interested in working with Dane. Debra Dominy then called Plaintiff to inform her that David said that he was not interested in hiring Parker to work with Dane, and that he would call Parker to let her know.

75. David called Parker and told her that he had picked someone else for the position and asserted that Parker and Plaintiff needed to work out their problems.

76. Just two days after Plaintiff's termination, the leadership team, that David was a key leader on, had already selected Dane to take over Plaintiff's position and the now profitable branch on 424 E. Main Street.[24]

77. There has been a female advisor at 424 E. Main Street since at least 2012. It was not until 2019, when the Branch became profitable, that a male Financial Advisor was assigned to take it over.

---

22  Prior to Dane's newly found interest in finance, Dane was a minor league baseball player.
23  Parker had expressed to Plaintiff that she could not keep up with Plaintiff's productive pace and was at her "max capacity."
24  On April 23, 2019, Gregg Nichols, a financial advisor at the Firm, told a client, Traci Sanchez, to just "hang in there and give the new guy (Dane) a chance." After hearing of this from Traci, Plaintiff called Gregg Nichols to ask who her replacement was, which is when Gregg Nichols informed Plaintiff of Dane's new role at the Firm.

**Continued Disparagement Of Plaintiff's Business**

78. After Plaintiff's termination, Parker continued to disparage Plaintiff as a Financial Advisor to Plaintiff's clients. Specifically, and among other false remarks, Parker stated that "you just don't know what happens behind closed doors,"[25] that Plaintiff left the Firm on bad terms, and that Plaintiff treated Parker so horribly that she had to get professional counseling.

79. Gregg Nichols falsely informed other clients[26] that they would be "penalized" for moving their accounts to Plaintiff's new employer.

80. Dane, acting as the replacement financial advisor for Plaintiff, was telling Plaintiff's clients that Plaintiff was overcharging them for services while working at the Firm, in addition to false information concerning Plaintiff's departure from the Firm, in violation of several securities laws.[27]

81. Among Plaintiff's clients was Joe Ramos ("Ramos"), who attended a meeting at the Firm with Dane in late June 2018. At this meeting, Dane informed Ramos that Plaintiff was no longer working at the Firm due to HR issues.

82. This systemic, pervasive and severe discriminatory behavior towards Plaintiff has had and continues to have negative repercussions on her career, business interests and her livelihood.

**Exhaustion of Administrative Remedies**

83. Plaintiff made a timely filing with the Texas Workforce Commission Civil Rights Division (hereafter TWCCRD) and concurrently with the Equal Opportunity Employment Commission (hereafter EEOC) on October 11, 2019.

---

25  Referring to the forced sexual encounter with Gervais in 2016.
26  Jeremy and Lori Reynolds on June 8, 2018 at the Heritage Festival Ball.
27  See 15 U.S.C. § 77a; 15 U.S.C. §80b-1, et seq.

84. The Charge Numbers were TWCCRD Charge No. 1B19780 and EEOC Charge No. 31C-2020-00378.

85. The TWCCRD issued its NOTICE OF DISMISSAL AND RIGHT TO FILE CIVIL ACTION on February 6, 2021. (Attached as **Exhibit - A**)

86. This matter is timely filed within sixty (60) days of the date of dismissal and issuance of the right to sue letter.

### Violation of Title VII of The Civil Rights Act of 1964

87. Title VII of the Civil Rights Act of 1964 prohibits discrimination in the workplace based on race, color, national origin, and gender. Plaintiff is a member of the protected class of people for whom the law was enacted. At all times relevant hereto Plaintiff had a right to be free from discrimination based upon her gender, to be free from unwanted sexual advances and predation in the workplace. At all times hereto Plaintiff was qualified for further promotion and her successful turnaround of a the troubled branch in Nacogdoches qualified her for promotion to the highest pay level, a raise of some 33%.

88. Contrary to its obligations under the law, Defendant subjected Plaintiff to sexual predation by a senior team leader employee with has history of praying on young women. The harassment of Plaintiff was pervasive and sever creating a hostile work environment and subjecting Plaintiff to shame and embarrassment. When confronted with the facts of the sexual harassment, Defendant treated the predator and victim in an irregular disparate manner, essentially rewarding the predator ensuring no future consequences for his illegal acts while retaliating against the victim permanently marring her employment record for the public to see on Broker Check while allowing the predator to escape accountability.

89. Defendant then subsequently failed to provide Plaintiff with any of the requested support in dealing with an insubordinate office administrator, instead illegally terminating

Plaintiff for being a victim of the sexual predator Edward Jones had provided as a senior team leader over Plaintiff and terminating Plaintiff for washing and drying her breast pump in her own branch, out of site and between client meeting.

90. Further, Plaintiff's termination occurs just as the son of another Financial Advisor with the company completes his Series 7 exam, with Defendant denying Plaintiff the benefit and promotion in pay for her achievement of making the branch profitable and instead terminating Plaintiff and giving the branch to Dane Phillips within two-days of Plaintiff's termination.

91. All of the foregoing create an inference that Defendant terminated Plaintiff in violation of Title VII of the Civil Rights Act of 1964 and that the reasons offered by Defendant for Plaintiff's termination not only show a violation of the act on their face and complete failure to accommodate the needs of a working mother, but expose many of the stated reasons as being a pretext at best.

## Business Disparagement

92. Subsequent to Plaintiff's termination by Defendant, Defendant's agents continued to publish disparaging remarks about Plaintiff overcharging clients during her employment by Defendant and making threatening statements about doing business with Plaintiff to Plaintiff's clients and members of the public. The statements were false when made and made with the intent of prejudicing those to whom they were published against Plaintiff. Defendant published the words without any privilege and the publication caused special damages to plaintiff in lost referrals, loss of clients and income.

## Jury Demand

93. Plaintiff requests a trial by jury on all claims.

## Prayer

WHEREFORE PREMISES CONSIDERED, Plaintiff prays that this Court enter a judgment in favor of Plaintiff against Defendant for:

94. Defendant's violation of Plaintiff's Civil Rights subjecting Plaintiff to gender discrimination, sexual discrimination, sexual predation, sexual harassment and a hostile work environment, retaliation for the aforesaid, and for Defendant's disparate and irregular treatment and retaliation against Plaintiff for being the victim of a sexual predator employed by Defendant as provided under Title VII of the Civil Rights Act of 1964;

95. Defendant's failure to promote, denial of raises and promotions and illegal termination of Plaintiff under Title VII of the Civil Rights Act of 1964;

96. Award compensatory damages, including front pay and back pay according to proof;

97. Award all special damages occasioned by Defendant's disparaging words against Plaintiff's business interests;

98. Reinstate Plaintiff to her branch;

99. Award all costs and attorneys' fees incurred prosecuting this claim;

100. All liquidated damages and all appropriate statutory and regulatory damages;

101. Punitive and exemplary damages as allowed by law sufficient to deter like conduct by similarly situated defendants;

102. Award interest at the maximum legal rate; and

103. All other and further relief, both general and special, at law and at equity, to which Plaintiff may show herself justly entitled.

Date: April 2, 2021

          Respectfully Submitted,

          **RANKIN LAW FIRM, PLLC**

          By: ___/S/_____
              David C. Rankin
              State Bar No. 00797284
              510 Ochiltree Street
              Nacogdoches, Texas 75961
              (936) 560-3860
              david@rankinlawfirm
              LEAD ATTORNEY

          **LAW OFFICE OF PAUL A. ROBBINS**

          By: ___/S/_____
              Paul A. Robbins
              State Bar No. 24002849
              116 E. Lufkin Ave.
              Lufkin, Texas 75901
              (936) 637-0800
              (936) 637-1172 fax
              parobbins@consolidated.net

          ATTORNEYS FOR AMANDA DAUGHERTY